**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RODNEY GLOVER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 3:17-cv-00761** |
| **v.** | ) | |
| | ) | **Judge Trauger** |
| **SHAWN PHILLIPS, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM</u>**

Rodney Glover, an inmate of the Morgan County Correctional Complex in Wartburg, Tennessee, filed a pro se petition for writ of habeas corpus challenging his 2010 convictions and sentence for conspiracy to commit aggravated burglary; aggravated burglary; conspiracy to commit theft of property valued at over $10,000 but less than $60,000; aggravated robbery; aggravated kidnapping; and theft of property valued at less than $500, for which he is currently serving fifty years of imprisonment in the Tennessee Department of Correction. (Doc. No. 1).

The respondent has filed an answer to the habeas petition. (Doc. No. 11). The petition is ripe for review, and this court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the court finds that an evidentiary hearing is not needed, and the petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

**I.    Procedural History**

This case arises from the robbery of ninety-year-old victim Oma England inside her home, during which she was beaten, gagged, and left in restraints for over ten hours. On July 24, 2010, for his role in the crimes, a Montgomery County jury convicted Petitioner of conspiracy to commit aggravated burglary; aggravated burglary; conspiracy to commit theft of property valued at over

$10,000 but less than $60,000; aggravated robbery; aggravated kidnapping; and theft of property valued at less than $500. *State v. Glover*, No. M2011-00854-CCA-R3-DC, 2012 WL 1071716, at *1 (Tenn. Crim. App. Mar. 28, 2012). At sentencing, the trial court imposed a total effective sentence of fifty years' imprisonment. *Id*. The petitioner appealed, and the Tennessee Court of Criminal Appeals affirmed on March 28, 2012. *Id*. at *1.

The petitioner filed a timely petition for post-conviction relief in the Montgomery County Circuit Court. (Doc. No. 9, Attach. 15 at PageID# 1260-70). The post-conviction court appointed counsel, who filed an amended petition. (Doc. No. 9, Attach. 15 at PageID# 1280-81). However, the post-conviction court later granted Petitioner's motions to withdraw his appointed post-conviction counsel and to proceed pro se at his evidentiary hearing. (Doc. No. 9, Attach. 15 at PageID# 1285-88). Following an evidentiary hearing, the post-conviction court denied the petition. (Doc. No. 9, Attach. 15, PageID# 1306-17). The petitioner filed a timely notice of appeal, and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Glover v. State*, No. M2016-00619-CCA-R3-PC, 2016 WL 7190903, at *1 (Tenn. Crim. App. Dec. 12, 2016), *perm. app. denied* (Feb. 16, 2017). The Tennessee Supreme denied the petitioner's application for discretionary review. *Id*.

On April 19, 2017, the petitioner filed the instant pro se petition for writ of habeas corpus.[1] (Doc. No. 1 at 16). By order entered on June 23, 2017, the court directed the respondent to file an answer, plead or otherwise respond to the petition in conformance with Habeas Rule 5. (Doc. No. 7). The respondent filed an answer to the petition on July 26, 2017, conceding that the petition is

---

[1] Under the "prison mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in *Richard v. Ray*, 290 F.3d 810, 812 (6th Cir. 2002) and *Scott v. Evans*, 116 F. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court. Here, the petitioner signed and dated his petition on April 19, 2017, although the Clerk's Office did not receive and file the petition until April 26, 2019. Under the prison mailbox rule, the court considers April 19, 2017, as the date of filing.

timely and urging the court to dismiss the petition. (Doc. No. 11). The petitioner filed a response to the respondent's answer. (Doc. No. 16).

In his petition, the petitioner asserts that he received ineffective assistance of trial counsel when counsel allegedly failed to:

a.  Obtain and provide the petitioner with discovery;

b.  Adequately explain the nature of the charged offenses;

c.  Move for suppression based on the petitioner's claim of brain damage;

d.  Subpoena defense witnesses in Georgia;

e.  Investigate a State's witness;

f.  Adequately prepare proper motions and memoranda of law;

g.  Object to an alleged chain of custody issue concerning a cigarette butt;

h.  Use or provide the petitioner with a letter concerning the petitioner's co-defendant;

i.  Challenge the sufficiency of the evidence establishing the theft of property element of the petitioner's aggravated robbery conviction at trial; and

j.  Request specific jury instructions or object to the given jury instructions.

The petitioner further asserts that he received ineffective assistance of appellate counsel. (Doc. No. 1 at 5-6).

## III.  Summary of the Evidence

### A.  Trial Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at the petitioner's jury trial as follows:

> On October 16, 2008, Vickie Terrell went to the home of then 90–year–old Oma England, where Ms. Terrell was employed as a part-time caregiver for Ms. England. She arrived at approximately 8:00 in the morning to take Ms. England to a 9:00 appointment. Upon her arrival, Ms. Terrell was immediately "alerted" that

something was wrong because the garage door was still down, which was unusual because Ms. England routinely opened the door when expecting Ms. Terrell. Ms. Terrell also noticed a screen removed from a garage window and a bench knocked over near the garage. Once she entered the garage, Ms. Terrell saw that Ms. England's 2006 Mercury Milan was gone and that several items littered the garage floor. Ms. Terrell opened the door to the home and, without stepping inside, she could see the house was "disordered." She called the victim's name twice and "backed out" of the home to telephone the Clarksville Police Department (CPD).

Officer Ben Blackmon responded to Ms. Terrell's call. He entered the home to make sure no one was inside. He noted that the home was in "extreme disarray" with furniture turned over, pictures removed from the walls, drawers pulled out, and paperwork scattered on the floor. Officer Blackmon searched the basement and main level floors before going upstairs. Each room had "stuff thrown all over" the floor. As he entered an upstairs bedroom, Officer Blackmon saw a body lying on a bed. The body was completely covered except for the feet. When Officer Blackmon saw one of the feet move, he immediately entered the room to "render aid." Officer Blackmon identified the person on the bed as the victim, Ms. England. The victim's feet and hands were bound to the bed with electrical cords. Officer Blackmon cut the electrical cords in order to release the victim. The victim told Officer Blackmon that she needed water and a doctor. Emergency medical technicians soon arrived and transported Ms. England to the hospital.

Doctor Robert Paasche, an emergency room physician with Gateway Medical Center at the time of the victim's assault, treated the victim when she arrived at the hospital. He described the victim as "an elderly woman who had been beaten quite severely." The victim suffered "intensive bruising and swelling about both eyes and the face." She was unable to open her eyes. She also experienced tenderness and bruising to the left side of her chest, bruising and swelling to her forearms and wrists, and a "skin tear" on her left arm. The victim suffered "quite a bit of pain" from fractures to bones in her face and hands. Doctor Paasche determined that the victim had been tied to the bed for an "extended period of time." Doctor Paasche ran tests to determine the victim's "skeletal muscle enzyme level." He explained that a normal enzyme level is 100. His testing revealed that the victim's enzyme level, however, reached 1,700, indicating that the victim had lain in the same position for ten to 12 hours. At that level, the victim was at an increased risk for kidney failure.

CPD officers "processed" the victim's home in the days following the assault. All of the officers described the home as "totally ransacked." From the home, they collected latex gloves, the electrical cords used to bind the victim, and a pillowcase that had been placed over the victim's head. Several days later, Ms. Terrell found a "cigarette butt" in a corner of the foyer while she helped the victim's daughter, Nancy Williams, clean the home. Knowing that no one smoked in the home, Ms. Terrell gave the partially-smoked cigarette to Ms. Williams who then gave it to Sergeant Liane Wilson.

Within days of the assault, another CPD investigator, Detective Brad Crowe, received a telephone call concerning a suspected stolen vehicle found abandoned at a local used car lot. Detective Crowe collected more partially-smoked cigarettes and a Pepsi bottle from the abandoned Ford F–250. He also found a business card for Accurate Welding and Ornamental Iron, a Georgia business, behind the front seat of the truck. Testing performed at the Tennessee Bureau of Investigation Crime Laboratory later confirmed the presence of the defendant's and co-defendant Colin Savage's fingerprints and deoxyribonucleic acid (DNA) on several items collected from the victim's residence and the truck.

Detective Timothy Finley determined that the license plate on the abandoned truck had been stolen from a vehicle in a local Walmart parking lot. Through a trace of the truck's vehicle identification number, Detective Finley also determined that the truck belonged to the owner of Accurate Welding and Ornamental Iron, who had reported the truck stolen. The victim's car was later found in Georgia. The defendant became a suspect following interviews with the victim's stepson-in-law, John Privette. When Detective Finley learned that the stolen truck originated from Jonesboro, where the defendant also lived, the investigators "became real interested in" the defendant as a suspect.

On November 8, 2008, Detective Finley received a letter from the defendant implicating Mr. Savage as a co-participant in the offenses. In the letter, the defendant also disclosed the location of many stolen items. Investigators located the items on property owned by Mr. Savage's mother and at a neighbor's home where the defendant had stayed. Investigators found jewelry, purses, coin sets, scarves, and flatware belonging to the victim at both residences. They also discovered a black nightstick in the family room of the home where the defendant was staying. Telephone records revealed that someone telephoned Mr. Savage's cellular telephone from the victim's residence at 10:36 p.m. on October 15 and again at 2:12 a.m. on October 16. Investigators also learned that the victim, who had a subscription to "Lifeline," an emergency service, received a call from the service at 11:41 p.m. on October 15.

Nancy Williams, the victim's daughter, testified that her father, Maurice Coursey, died more than 15 years ago and that the victim later married George England. Mr. England had two children, George and Nancy. Mr. England's daughter, Nancy, was married to John Privette. Mr. England died in February 2008, and the victim was living alone at the time of the offenses. Ms. Williams lived in Baton Rouge, Louisiana but visited the victim three or four times a year. The Terrells worked for the victim, doing household chores and maintenance and driving the victim to appointments.

Ms. Williams recalled when the offenses occurred. She said she flew straight to Clarksville upon learning of the victim's assault. The victim spent one week in the hospital and several more in a rehabilitation center. Ms. Williams described the

victim's home as a "total wreck." Ms. Williams recalled Ms. Terrell's finding a partially-smoked cigarette as they cleaned the victim's home. She gave the cigarette to Sergeant Wilson. Ms. Williams recalled that a blue aquamarine necklace purchased by her father in 1948 for her mother was among the items stolen. The victim's assailants also took Mr. England's West Point ring, a large diamond ring, an "elaborate gold bracelet," and a mink coat, as well as the victim's car. The insurance value of the items totaled between $15,000 and $20,000.

The victim, Oma Nell Woodson Coursey England, testified that she was born on March 26, 1918. She recalled being assaulted as she lay asleep in bed late one night. She said, "[A]t least two [men] jumped on my body and started kicking and hitting me ..., [and] they stomped on me with their rough feet." She said the men covered her face with some kind of cloth—"like a funeral." She stopped trying to fight the men, and they bound her feet and hands. She did not see her attackers and had never met the defendant or Mr. Savage. She did, however, know Mr. Privette as her stepdaughter's husband. The victim described her two husbands as "very generous men" and said that the attackers took "[e]verything she had ... that night." She considered herself "fortunate to have not been killed."

Joseph DeMaio, an inmate at the Montgomery County Jail, met the defendant as the defendant awaited trial. The two men became friends, and Mr. DeMaio often asked his mother to perform computer research for the defendant. Mr. DeMaio recalled the defendant's admitting his involvement in the offenses. The defendant told Mr. DeMaio that Mr. Privette told the defendant that the victim kept "gold and silver bullion" and cash in a safe at her home. The defendant admitted that he entered the victim's home and that he tied up the victim when the victim began struggling with him. After restraining the victim, the defendant telephoned Mr. Savage, who assisted in ransacking the home in search of the valuables. The defendant referred to Mr. Savage as a "chicken shit" because Mr. Savage fled the home when "Lifeline" personnel contacted the home. The defendant told Mr. DeMaio that he "thought [the victim] was in her 70's; had [he] known she was that old [he] never would have [tied her up]." The defendant also told Mr. DeMaio that he and Mr. Privette owed Mr. Savage money for methamphetamine.

The defendant testified at trial and denied ever meeting Mr. DeMaio while housed at the Montgomery County Jail or telling Mr. DeMaio anything about the offenses. He affirmed the accuracy of his 2008 statement to CPD Detective Timothy Anderson. The defendant testified that he met Mr. Privette, who asked him to rob his wife's stepmother. Mr. Privette claimed the victim kept "gold bars and silver bars" in a safe in her home. Mr. Privette promised the defendant that his portion of the theft proceeds would total between $100,000 and $300,000. The defendant testified that he plotted with Mr. Privette to commit the burglary and theft because he needed the money "due to his poverty" and to support his methamphetamine addiction.

The defendant testified that he procured Mr. Savage's assistance in committing the offenses. The defendant said that he and Mr. Savage traveled to the victim's home in Clarksville. Before arriving at the home, the defendant and Mr. Savage stopped at a Walmart parking lot where they stole a license plate from a vehicle to place on the truck they were driving. At the victim's home, the defendant "jimmied" the sunroom door open and found keys where Mr. Privette told him they were kept. The defendant entered the victim's home between 10:00 and 11:00 p.m. and first located a safe in the basement where he found coins and stamps. He did not, however, find the gold, silver, and cash as promised by Mr. Privette. The defendant then telephoned Mr. Savage to join him in "going through rooms" in search of valuables.

The defendant admitted putting a pillowcase over the victim's head, but he denied beating the victim. The defendant said that Mr. Savage beat the victim while the defendant searched drawers for valuables. The defendant recalled that the victim "was calling on Jesus, and [Mr.] Savage told [the defendant] he was a[n] athiest. And that's the only reason [the defendant could] think that [Mr. Savage] hit her, or to knock her out." The defendant eventually told Mr. Savage to stop hitting the victim. When the defendant accidentally knocked the telephone to the floor, alerting the victim's "Lifeline" system, Mr. Savage became startled and ran from the home. The defendant faked his voice to assure the "Lifeline" personnel that everything was okay. He then loaded the victim's car with the stolen items and spent the night driving around in search of Mr. Savage. Unable to locate Mr. Savage, the defendant drove back to Georgia, where he abandoned the victim's car.

Walter Vaughn, an inmate in the Montgomery County Jail at the same time as the defendant and Mr. Savage, testified at trial that Mr. Savage told him details about the offenses. Mr. Vaughn testified that Mr. Savage admitted tying up the victim and beating her. He also told Mr. Vaughn that the defendant disguised his voice as an elderly lady's voice to dupe the "Lifeline" personnel. According to Mr. Vaughn, Mr. Savage returned to the home sometime during the night in search of more valuables before telephoning his mother in Georgia to pick him up.

With this evidence, the jury convicted the defendant of conspiracy to commit aggravated burglary, aggravated burglary, conspiracy to commit theft of property valued at over $10,000 but less that $60,000, aggravated robbery, aggravated kidnapping—all related to offenses committed against Ms. England—and theft of property valued at less than $500, related to the stolen license plate.

At the sentencing hearing, the parties agreed that the [Petitioner] qualified as a Range II, multiple offender based upon his history of criminal convictions. The [Petitioner] testified that his most serious prior conviction, vehicular homicide, arose from a high speed chase from the police during which his passenger and good friend was killed. During the same incident, the [Petitioner] suffered severe head injuries and was hospitalized in a coma for several months. After his trial in the instant case, the [Petitioner] testified against Mr. Savage in Mr. Savage's separate

trial. The [Petitioner] expressed remorse to the victim and her family for the offenses.

....

The court then ordered that the sentences in counts one and two be served concurrently (for an effective sentence of 10 years), and that the sentences in counts three and four be served concurrently (for an effective sentence of 20 years), but it ordered that each concurrently aligned pair be served consecutively to one another and to the 20 year sentence imposed in count five. Thus, the trial court imposed a total effective sentence of 50 years' incarceration.

*State v. Glover*, 2012 WL 1071716, at **1-5.

**B.     Post-Conviction Proceedings**

The Tennessee Court of Criminal Appeals summarized the proof adduced at the petitioner's post-conviction evidentiary hearing as follows:

At the post-conviction hearing, the Petitioner testified that Counsel represented him from 2005 to 2008. He described their communication during this time period as "not much." The Petitioner was housed at the Turney Center at the time, approximately an hour's drive from Nashville. He recalled that Counsel twice met with him at Charles Bass Correctional Complex, the first time being when he was first charged and, once again, right before trial. The Petitioner also met with Counsel at approximately thirty-five court hearings, and during four or five phone calls that were five to ten minutes each in length.

The Petitioner filed a petition for post-conviction relief, pro se, in which he alleged that he had received the ineffective assistance of counsel. The post-conviction court appointed an attorney, and the attorney filed an amended petition, alleging that the Petitioner had received the ineffective assistance of counsel because Counsel failed to review with or provide to the Petitioner the "whole of the evidence," resulting in the Petitioner not informing Counsel of facts that would have shown the jury that he was not guilty of aggravated robbery. He also alleged that Counsel failed to adequately present or investigate the theory that the Petitioner did not assault or injure the victim during the robbery. The Petitioner subsequently filed a motion requesting that his appointed post-conviction counsel be dismissed for a conflict of interest. The Petitioner's motion was granted, and the Petitioner elected to proceed pro se.

The post-conviction court subsequently held a hearing, during which the following evidence was presented: Counsel testified that he reviewed the State's discovery with the Petitioner at the jail. Counsel agreed that he planned to send an investigator to Georgia to question witnesses. He clarified that he obtained funding for the

investigator through the State and that the investigator did not go to Georgia after Counsel discussed with the Petitioner "the viability of utilizing those people [in Georgia] as witnesses and with the complications of not being [sic] to contact them through the investigator in addition to the lack of information that was provided." After this discussion, Counsel and the Petitioner "chose to proceed" without the witnesses in Georgia. One listed witness, Jason Harley, had given a statement that Counsel and the Petitioner reviewed, and "it became apparent" that Mr. Harley falsely testified against the Petitioner at Mr. Savage's request. Counsel testified, however, that Mr. Harley's false testimony did not change the facts that [the Petitioner] had confessed and testified on multiple occasions that [he] had been in [the victim's] room when Mr. Savage attacked the victim and so any evidence [Mr. Harley] could give ... didn't change the fact that [the Petitioner] was ultimately involved in the attack on [the victim], by [his] own words.

Counsel testified that, during his representation of the Petitioner, Counsel addressed the trial court about issuing subpoenas for the Georgia witnesses. Counsel recalled that the trial court declined to delay the trial to procure the Georgia witnesses because Counsel had not shown that there was a material reason for them to be present at trial.

Counsel stated that his trial strategy was "anticlimactic" because the Petitioner had confessed several times and admitted to being in the victim's home, so the "goal" was not to prove that the Petitioner was not there when the crime occurred. Counsel recalled that the Petitioner maintained that he had not stolen certain items from the victim's home that were later recovered, but Counsel testified that the Petitioner's stance did not have anything to do with the main charges against him—aggravated kidnapping, aggravated assault, and aggravated robbery. Counsel testified:

> Those were charges that were going to put [the Petitioner] in prison for an extended period of time and ... it didn't matter how much [he] stole, it was evidence that [he] took something in the course of a robbery, in the course of a kidnapping, and in the course of a burglary and those were the issues we were trying to address that should have helped minimize any long-term prison sentence.

Counsel recalled that the State offered the Petitioner twenty-five years to serve at 100%, and Counsel believed that he would be able to negotiate the sentence down to eighteen years. The Petitioner, however, was adamant that the case go to trial despite Counsel warning him it was not in his best interest. Counsel testified that there was "overwhelming evidence" against the Petitioner.

Counsel agreed that Mr. Savage gave several inconsistent statements about the Petitioner's involvement, but Counsel stated that because the Petitioner had admitted to being a part of the crime, the inconsistencies in Mr. Savage's statements were not helpful to his defense. Counsel testified:

I was belaboring under the belief that [the Petitioner] did not know how the victim was tied up, so when [the Petitioner] went into [the victim's] home, it was ... my belief prior to trial that at some point after Mr. Savage had left the [the Petitioner] could not locate him that evening, [Mr. Savage] had come back and done additional harm [to the victim]. [The Petitioner's] statements ... w[ere] that the [victim's] house when [he] left was not in disarray, ... [t]hat [the victim] had not been tied up when [the Petitioner] was present[.] ... [S]o we went to trial with the hope of eliminating some of the elements of the charges against [the Petitioner], which we were successful at, the jury did not find that [the Petitioner] committed serious bodily injury in the acts done upon [the victim], but also we had hoped to be able to show that Mr. Savage at some point had gone back to the home and had taken more things and had actually done the harm to [the victim] ... But once [the Petitioner] testified, all that was out the window. It became apparent during the trial that Mr. Savage did not go back and that [the Petitioner] was in the room when [the victim] was tied up, so that changed our course in respect to the second part of our tactic at trial.

Counsel testified that he did not present to the jury the theory that Mr. Savage had returned to the victim's home alone and furthered the crime without the Petitioner because "there was no evidence that we could collect or witnesses that saw him re-enter the home and [the victim] didn't have any recollection and made no statement as to that occurring."

On cross-examination, Counsel testified that he had been practicing law since 2005 and that he was the Petitioner's fifth appointed attorney in this case. Counsel testified that the Petitioner was facing up to one hundred and twenty-five years if convicted and that his case "became the crux of [Counsel's] practice. Counsel spent "an enormous amount of time with [the Petitioner], up to almost the neglect of [Counsel's] practice." Counsel worked "long hours" "very diligently" on the Petitioner's case and met with the Petitioner "more than any other client" Counsel had ever represented. Counsel explained to the Petitioner his possible sentence, the elements of the charges for each count, reviewed and discussed the evidence contained in discovery. The Petitioner was "active" in discussing his case, and the two men discussed trial strategy which was to show that Mr. Savage injured the victim. That strategy "fell apart pretty quickly," but Counsel was able to convince the jury that the victim did not suffer serious bodily injury, which lessened the Petitioner's exposure to a longer sentence.

Regarding the Petitioner's decision to testify, Counsel went over his prospective testimony, which included the Petitioner admitting to being present at the victim's house. Counsel hoped that the Petitioner would be seen as a "sympathetic witness" and an "unwitting participant" in Mr. Savage's crime. Instead, the Petitioner further implicated himself through his testimony and made statements that he had never

disclosed to Counsel. Counsel said that, if he had known how the Petitioner was going to testify, he "would have advised [the Petitioner] strongly not to take the stand."

The Petitioner testified that, based on the facts of the case, he felt that his charges were too severe. He agreed that he testified twice under oath in this case, and agreed that he implicated himself by testifying that he was inside the victim's home. The Petitioner agreed that he stole items from the victim's home and disguised his voice as the victim's when emergency services called to check on her. He agreed he had stolen the victim's vehicle. He agreed that he gave an extensive statement to the police about his involvement.

The post-conviction court issued an order denying the Petitioner relief, finding, relevant to this appeal, that the Petitioner had not established by clear and convincing evidence that Counsel was ineffective for failing to subpoena witnesses from out-of-state. The post-conviction court stated:

> [The] Petitioner contends [that Counsel] failed to adequately investigate the facts, interview witnesses, consider possible defenses, or matters which might serve to mitigate the offense. The proof at [the post-conviction hearing] established that [Counsel] reviewed materials and assembled witness statements and that he, with the consent of the Petitioner, developed a trial strategy in an effort to mitigate the offense, and to establish that the Petitioner was not responsible for any bodily injury. Therefore, this contention is without merit.
>
> ....
>
> [The] Petitioner indirectly contended that there were witnesses that were not called, which [the] Petitioner now contends should have been presented. [The] Petitioner presented no proof at the [post-conviction] hearing that the witness or witnesses he desired to have been called would have presented testimony that would have been admissible and material to his defense. Consequently, there is [no] showing that the failure to call such witness or witnesses was prejudicial.

The post-conviction court concluded that the Petitioner had failed to establish his ineffective assistance of counsel claim by clear and convincing evidence.

*Glover*, 2016 WL 7190903, at **4-7.

## III.     Standard of Review

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct, and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). State-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woo*ds, 692 Fed. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v.*

*Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotation marks omitted)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320,

327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id*. Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id*. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law

prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who

is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

## IV.    Analysis

With these principles in mind, the court will turn to the examination of the claims raised in Glover's petition for habeas relief, all of which are ineffective assistance of counsel claims.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 686-87; *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000).   In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.   Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004).   The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695.   "The determinative issue is not whether petitioner's counsel

was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted).

The court will begin with Petitioner's two properly defaulted claims.

### 1.     Claim 1D:  Trial counsel failed to subpoena defense witnesses in Georgia

In Claim 1D,  the petitioner claims that his trial attorney was constitutionally ineffective because he failed to subpoena witnesses in Georgia that the petitioner requested.  (Doc. No. 1 at 6).  The respondent concedes that the petitioner exhausted this claim and contends that the state court's adjudication on this issue was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court.  (Doc. No. 13 at 15-19).

The petitioner raised this same claim in his petition for post-conviction relief.  The post-conviction court denied relief, finding that the petitioner had failed to establish his ineffective assistance of counsel claim by clear and convincing evidence.  *Glover*, 2016 WL 7190903, at *7. On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals set forth the governing legal standard for claims of ineffective assistance of counsel.  *Id*. at **7-8. Applying *Strickland* and its progeny, the state appellate court concluded that the evidence in the record supported the post-conviction court's conclusion that trial counsel's performance was not deficient.  *Glover*, 2016 WL 7190903, at *9.

Regarding trial counsel's performance, the Court of Criminal Appeals held that the post-conviction court did not err when it determined that trial counsel made a reasonable, strategic decision not to subpoena the Georgia witnesses.  As the state appellate court explained:

> With regard to the witnesses in Georgia, Counsel testified that he made the decision to proceed without the witnesses, in part because he had no way of contacting them and no information to provide his investigator as to their whereabouts, and in part because the trial court denied his request to delay the trial in order to find the witnesses.

*Glover*, 2016 WL 7190903, at *9. Furthermore, because the petitioner had given several statements implicating himself in the crimes, trial counsel elected to pursue a defense theory of minimizing the petitioner's involvement with the aggravated elements of the charged offenses. *Id.*

During the petitioner's post-conviction hearing, trial counsel testified that the people from Georgia that petitioner wanted to testify would have further implicated the petitioner and "in no way did anyone have any information that would exonerate Mr. Glover." (Doc. No. 9, Attach. 16 at PageID# 1354-55). Thus, having determined that the Georgia witnesses would not have aided in counsel's trial strategy, counsel decided not to call or subpoena these witnesses. It is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion." *Dixon v. Houk*, 737 F.3d 1003, 1012 (6th Cir. 2013). In order to fairly assess an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." *Strickland*, 466 U.S. at 689. "[S]trategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

Regarding prejudice, the Tennessee Court of Criminal Appeals found that, "[i]n order to grant the Petitioner relief, he is required to present those witnesses during the post-conviction hearing and establish that Counsel could have located them. The Petitioner has done neither in this case and thus, he is not entitled to relief." *Glover*, 2016 WL 7190903, at *9 (internal citation omitted). The Sixth Circuit has instructed that when "one is left with pure speculation on whether the outcome of [the criminal proceeding] could have been any different, [there is] an insufficient basis for a successful claim of prejudice." *Baze v. Parker*, 371, F.3d 310, 322 (6th Cir.2004*), cert.*

*denied*, 544 U.S. 931 (2005). Moreover, trial counsel testified at the petitioner's post-conviction hearing that

> [t]he amount of evidence in this case was overwhelming. He [Glover] admitted he was in the house, he didn't deny it. And even to me, he admitted that he was there and he stated that Mr. Savage stuck the victim while he was in the room while they were burglarizing the home.

(Doc. No. 9, Attach. 16 at PageID# 1351). Counsel further testified that, when the petitioner testified during his post-conviction evidentiary hearing, he implicated himself further, making statements that he had never disclosed to counsel previously. (*Id.* at PageID# 1353).

The court agrees with the state courts that the evidence against the petitioner was so overwhelming that any failure of trial counsel to subpoena defense witnesses in Georgia would not have resulted in a reasonable probability that, had trial counsel subpoenaed the witnesses, the petitioner's trial would have turned out differently. *See Kelley v. United States*, No. 1:13-cv-70, 1:08-cr-51, 2014 WL 2921821, at *14 (E.D. Tenn. June 27, 2014) (holding that petitioner's unsupported claims of what counsel failed to do, without any evidence of what a more thorough investigation would have revealed, was insufficient to demonstrate by a preponderance of the evidence that counsel performed deficiently; moreover, even assuming that counsel performed deficiently, petitioner failed to establish a reasonable probability that, had counsel conducted a more extension investigation, the outcome of Petitioner's case would have been different). The court finds that the state courts' decisions were based on a reasonable determination of the facts and that the state courts' application of the *Strickland* factors was reasonable. The petitioner therefore is not entitled to relief on this claim.

## 2.    Claim 1E:  Trial counsel failed to investigate the State's lead detective

Next, the petition alleges that trial counsel provided constitutionally deficient representation because he failed to investigate the lead detective, a State's witness.  (Doc. No. 1 at 6).[2]  The respondent concedes that the petitioner exhausted this claim and contends that the state court's adjudication on this issue was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court.  (Doc. No. 13 at 19-21).

The petitioner alleged in his post-conviction petition and on appeal of the denial of his petition that trial counsel's performance was deficient because he failed to investigate the lead detective in the case.  (Doc. No. 1 at 6).  The post-conviction court denied relief.  In evaluating this claim on appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals applied *Strickland* to the facts of the petitioner's case and agreed with the post-conviction court that trial counsel's performance was not deficient or prejudicial, finding that

> [t]here is ample evidence that Counsel thoroughly investigated and prepared this case: he reviewed discovery with the Petitioner, hired an investigator to interview neighbors and other possible witnesses, met with the Petitioner numerous times, and worked "diligently" in preparation for trial. The State's evidence against the Petitioner was overwhelming, particularly due to the fact that the Petitioner admitted to some extent his involvement in the crime. Counsel was able to exploit where the State had not proven the Petitioner's involvement and the jury found that the Petitioner had not committed bodily harm against the victim. The Petitioner has not proven by clear and convincing evidence that had Counsel interviewed the detective, Counsel would have been more prepared to go to trial. We conclude that Counsel was diligent and effective in his representation of the Petitioner. Accordingly, we conclude that the Petitioner is not entitled to relief.

*Glover*, 2016 WL 7190903, at *9.

---

[2] The petitioner also alleges that trial counsel provided ineffective assistance when he failed to interview multiple State witnesses.  (Doc. No. 1 at 6).  However, the petitioner only properly exhausted his claim of ineffective assistance of counsel for failing to interview the lead detective.

These findings were not unreasonable. With respect to trial counsel's performance, the record showed that trial counsel spent an enormous amount of time with the petitioner. Counsel testified at the petitioner's post-conviction hearing that he "worked very diligently on the case and met with [Glover] on—more than any other client [he has] ever had." (Doc. No. 9, Attach. 16 at 31). The record further showed that trial counsel hired an investigator to interview and locate possible witnesses. He succeeded at minimizing the petitioner's involvement in the crimes by convincing the jury that the victim did not receive serious bodily injury which, as trial counsel explained, "took a magnitude of exposure away from the potential sentencing of Mr. Glover." (*Id.* at 33).

Even if the petitioner had established that trial counsel's preparation and investigation were constitutionally deficient, the state courts' conclusion that the petitioner had not demonstrated prejudice as a result of the failure of trial counsel to interview the detective was not an unreasonable application of clearly established federal law, nor was it based upon an unreasonable application of the facts in light of the evidence before the state court. The petitioner failed to show how interviewing the lead detective would have resulted in a reasonable probability of a different trial outcome, considering the evidence against him. *See Kelley*, 2014 WL 2921821, at *14. This claim, like Claim 1D, is without merit and will be dismissed.

The court will now turn to the petitioner's procedurally defaulted claims of ineffective assistance of trial counsel: Claims 1A, 1B, 1C, 1F, 1G, 1H, 1I, and 1J.

      **3.      Claim 1A:     Trial counsel failed to obtain and provide the petitioner with discovery and to investigate the facts of the case**

      **4.      Claim 1B:     Trial counsel failed to explain adequately the nature of the charged offenses**

      **5.      Claim 1C:     Trial counsel failed to move for suppression based on the petitioner's claim of brain damages**

**6.      Claim 1F:      Trial counsel failed to prepare adequate motions and memoranda of law**

**7.      Claim 1G:      Trial counsel failed to object to an alleged chain of custody issue concerning a cigarette butt**

**8.      Claim 1H:      Trial counsel failed to use or provide the petitioner with a letter concerning the petitioner's co-defendant**

**9.      Claim 1I:      Trial counsel failed to challenge the sufficiency of the evidence establishing the theft of property element of the petitioner's aggravated robbery conviction at trial**

**10.     Claim 1J:      Trial counsel failed to request specific jury instruction or object to the given jury instruction**

In Claim 1A, the petitioner alleges that trial counsel was constitutionally ineffective because he "failed to adequately obtain and furnish Petitioner with complete discovery of records from District Attorney which could have contained *Brady* material, nor did [trial counsel] investigate the actual facts of the case."  (Doc. No. 1 at 5).  The petitioner raised this claim in his petition for post-conviction relief (Doc. No. 9, Attach. 15 at PageID# 1264) but failed to raise the claim on appeal of the denial of post-conviction relief (Doc. No. 9, Attach. 18, Page ID# 1398-1400).

In Claim 1B, the petitioner alleges that he "never fully understood the exact nature of the offenses" because trial counsel allegedly failed to explain "how [Petitioner's] supposed actions fit the elements of each offense."  (Doc. No. 1 at 5).  The petitioner raised this claim in his petition for post-conviction relief (Doc. No. 9, Attach. 15 at PageID# 1264) but failed to raise the claim on appeal  of the denial of post-conviction relief (Doc. No. 9, Attach. 18, Page ID# 1398-1400).

In Claim 1C, the petitioner alleges that trial counsel provided constitutionally deficient representation because he "failed to check the facts concerning the brain damage of the Petitioner." (Doc. No. 1 at 5).  According to the petitioner, trial counsel could have suppressed the petitioner's

confession using these facts. (*Id*.) The petitioner raised this claim during his post-conviction hearing (Doc. No. 9, Attach. 16 at Page ID# 1327, Doc. No. 9, Attach. 15 at PageID# 1313) but failed to raise the claim on appeal of the denial of post-conviction relief (*see generally* Doc. No. 9, Attach. 18).

In Claim 1F, the petitioner alleges that trial counsel provided ineffective assistance when he "failed to adequately prepare motions and memorandums [sic] of law to support the motions he did file." (Doc. No. 1 at 6). Petitioner raised this claim in his petition for post conviction relief (Doc. No. 9, Attach. 15 at PageID# 1264) but failed to raise it on appeal of the denial of post-conviction relief (*see generally* Doc. No. 9, Attach. 18).

In Claim 1G, the petitioner alleges that trial counsel provided ineffective assistance when he failed to object to an alleged chain of custody issue regarding a cigarette butt. (Doc. No. 1 at 6). Arguably, the petitioner raised this claim in his post-conviction petition (Doc. No. 9, Attach. 15 at PageID# 1315) ("failure to investigate crime scene…and to explore defenses"). In any event, the petitioner clearly raised the claim during his post-conviction hearing when he repeatedly questioned his former trial attorney about the DNA found on the cigarette butt. (Doc. No. 9, Attach. 16 at PageID# 1332-1336, 1356-57, 1360, 1363). However, the petitioner did not pursue this claim on appeal of the denial of post-conviction relief (*see generally* Doc. No. 9, Attach. 18).

In Claim 1H, the petitioner alleges that trial counsel provided ineffective assistance when he "did not use nor provide Petitioner with a letter" that allegedly would have shown that Mr. Savage, a co-defendant, "lied about his beating [the victim] a second time." (Doc. No. 1 at 6). The petitioner did not raise this claim in his petition for post-conviction relief, during his post-conviction hearing, or on appeal of the denial of post-conviction relief. He did not present the

letter during his post-conviction hearing (*see generally* Doc. No. 9, Attach. 16) and does not now present the letter in support of his federal habeas petition.

In Claim 1I, the petitioner alleges that trial counsel provided ineffective assistance by failing to show that the stolen items were not found with the petitioner. (Doc. No. 1 at 6). To the extent that the petitioner contends that trial counsel should have challenged the sufficiency of the evidence establishing the theft of property element of the petitioner's aggravated robbery conviction during trial, the petitioner raised such a claim in his post-conviction petition (Doc. No. 9, Attach. 15 at PageID #1266) but he failed to raise the claim on appeal of the denial of post-conviction relief (*see generally* Doc. No. 9, Attach. 18).

In Claim 1J, the petitioner alleges that trial counsel provided ineffective assistance by not requesting the specific jury instructions and by not objecting to the jury instructions the trial court provided to the jury. (Doc. No. 1 at 6). The petitioner raised this claim in his amended petition for post conviction relief filed by counsel (Doc. No. 9, Attach. 15 at PageID# 1281) but not on appeal of the denial of post-conviction relief (*see generally* Doc. No. 9, Attach. 18).

Because the petitioner has never fully and fairly presented these claims to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claims, the claims are deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. Thus, federal habeas review of the claims is barred unless the petitioner can demonstrate that cause and prejudice will excuse the procedural default or that failure to consider the claims will result in a fundamental miscarriage of justice. *See Harris*, 489 U.S. at 262; *Coe,* 161 F.3d at 329-30.

Petitioner acknowledges his default of these claims and argues that the ineffectiveness of "his attorney" (presumably his post-conviction attorney) excuses the defaults. (Doc. No. 1 at 6).

Indeed, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. However, the *Martinez* exception does not apply to claims that were raised at the post-conviction initial-review proceeding, like these claims, but were not preserved on post-conviction appeal. *West v. Carpenter*, 790 F.3d 693, 698-99 (6th Cir. 2015) (holding that "attorney error at state post-conviction appellate proceedings cannot excuse procedural default under the *Martinez-Trevino* framework."). This rule exists because a petitioner whose claims were heard on the merits on post-conviction initial review has received the opportunity *Martinez* was fashioned to guarantee: to ensure that "the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial review collateral proceeding." *Martinez*, 132 S. Ct. at 1316.

Unlike in *Martinez*, default occurred only after Glover failed to appeal the denial of post-conviction relief on these claims before the Tennessee Court of Criminal Appeals. As *West* instructs, "[a]lthough this failure may have been the product of attorney error, attorney error at state post-conviction appellate proceedings cannot excuse procedural default under the *Martinez–Trevino* framework." 790 F.3d 693, 699 (citing *Wallace*, 570 F. App'x. at 453). A claim of ineffective assistance of post-conviction appellate counsel does not provide cause to excuse the procedural default of the claims Glover raised below during initial collateral review proceedings. *See Atkins v. Hollway*, 792 F.3d 654, 661 (6th Cir. 2015) (applying *West*); *Young v. Colson*, No. 3:12-CV-00304, 2015 WL 9581768, at *11 (M.D. Tenn. Dec. 30, 2015) (denying petitioner's claims based on ineffectiveness of post-conviction appellate counsel, relying on *Martinez* and *Coleman*). Unlike *Martinez*, Petitioner "'had his day in court on th[ese] claim[s]'" because they were adjudicated during the initial review post-conviction proceeding. *Smith v. Carpenter*, No.

3:99-cv-0731, 2018 WL 317429, at *13 (M.D. Tenn. Jan. 8, 2018) (quoting *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012)). As a result, the petitioner cannot excuse the procedural default of these claims. Claims 1A, 1B, 1C, 1F, 1G, 1H, 1I, and 1J will be dismissed.

### 10. Claim 2: Appellate counsel failed to bring the previous deficiencies of trial counsel to the court's attention

Finally, the petitioner alleges that he received ineffective assistance of appellate counsel because appellate counsel "failed to present any of the above details to the appeals courts during direct appeal—in short, just as he had done during the entire legal procedure, he showed no interest in the case." (Doc. No. 1 at 6). The petitioner raised the ineffective assistance of direct appeal counsel in his post conviction petition (Doc. No. 9, Attach. 15 at PageID# 1266-67) and in his amended petition for post conviction relief (*Id*. at PageID# 1281). However, the petitioner did not raise the claim on appeal of the denial of his petition for post conviction relief. (Doc. No. 9, Attach. 18, Page ID# 1398-1400).

The claims therefore are considered to be exhausted (because no further state review is available) but procedurally defaulted (because they were never presented to the state appellate court), and may not be considered by the federal court on habeas review unless Petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors. *See Harris*, 489 U.S. at 262; *Coe,* 161 F.3d at 329-30.

Petitioner again acknowledges his default of Claim 2 and asserts that the ineffectiveness of his attorney excuses the default. (Doc. No. 1 at 6). However, as noted earlier, the *Martinez* exception does not apply to claims that were raised at the post-conviction initial-review proceeding but were not preserved on post-conviction appeal. *West*, 790 F.3d 693, 698-99. Like Claims 1A, 1B, 1C, 1F, 1G, 1H, 1I, and 1J, this claim must be dismissed because it was defaulted at the state

post-conviction appellate proceedings and *Martinez* does not excuse its default. Claim 2 will be dismissed.

## V.     Conclusion

For the reasons set forth herein, the petition filed by Randy Glover seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice. All of the petitioner's claims are either procedurally defaulted or fail on the merits.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of the petitioner's claims, the court will deny a COA.

An appropriate order will be entered.

Aleta A. Trauger
United States District Judge